O'MELVENY & MYERS LLP
RANDALL W. EDWARDS (S.B. #179053)
redwards@omm.com
Two Embarcadero Center
28th Floor
San Francisco, CA 94111
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

JONATHAN P. SCHNELLER (S.B. #291288)
jschneller@omm.com
REBECCA A. GIROLAMO (S.B. #293422)
rgirolamo@omm.com
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

*Attorneys for Defendant Fidelity Brokerage Services LLC*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMIR BALANZAR and CECELIA LAHR, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FIDELITY BROKERAGE SERVICES, LLC,<br><br>Defendant. | Case No. 22-CV-1372 GPC BGS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY BROKERAGE SERVICES LLC's MOTION TO DISMISS PLAINTIFFS' COMPLAINT**<br><br>[Notice of Motion and Motion; Declaration of Diane Brown; Declaration of Randall W. Edwards; Request for Judicial Notice; and [Proposed] Order Filed Concurrently]<br><br>Hon. Gonzalo P. Curiel<br>Courtroom: 2D<br>Date: January 27, 2023<br>Time: 1:30 PM |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................... 1

BACKGROUND ....................................................................................... 4

ARGUMENT ............................................................................................ 8

I.    AS A THRESHOLD MATTER, PLAINTIFF BALANZAR LACKS CONSTITUTIONAL STANDING TO BRING HER CLAIM. ........................................................................................... 8

    A.    Courts can consider evidence on a Rule 12(b)(1) motion to dismiss for lack of standing. .................................................. 8

    B.    Plaintiff Balanzar lacks standing because she has never been enrolled in MyVoice. .............................................. 8

II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER CALIFORNIA LAW. ........................................................... 9

    A.    Standard for dismissal under Rule 12(b)(6) .............................. 9

    B.    Plaintiffs fail to state a claim under section 637.3 because they do not plausibly allege that Fidelity analyzed voice stress patterns for lie detection. ........................................... 10

        1.    The plain text of section 637.3 regulates "voice prints" only to the extent they are recorded or analyzed as "voice stress patterns" for lie detection. ..... 11

        2.    Section 637.3's legislative history confirms the statute does not regulate the use of voiceprints for personal identification. ........................................ 13

        3.    The Complaint does not plausibly allege that Fidelity records or examines voice stress patterns for purposes of lie detection. ......................... 15

    C.    Plaintiffs fail to state a claim under section 637.3 because they do not plausibly allege that any recording or examination of a voice stress pattern occurred in California. ................................................................... 19

    D.    Plaintiff Lahr's CIPA claim fails because she entered into a written agreement that applies Massachusetts law to this dispute and expressly consents to the use of MyVoice. ........... 21

        1.    Plaintiff Lahr's claim fails because she agreed to have Massachusetts law govern this dispute. ............... 22

        2.    Plaintiff Lahr's claim fails because she provided express written consent to Fidelity's use of MyVoice. ....................................................... 23

CONCLUSION.......................................................................................... 25

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AI CA LLC v. CreditautoUSA Financial Co. LLC*,
  2022 WL 4798128 (S.D. Cal. Sept. 20, 2022)................................................22

*Allen v. Bank of America, N.A.*,
  Case No. 3:22-cv-01368 (S.D. Cal. filed Sept. 11, 2022) ...................................17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................................9, 18

*Berman v. Freedom Fin. Network, LLC*,
  30 F.4th 849 (9th Cir. 2022) ..............................................................................24

*Brennon B. v. Superior Ct.*,
  13 Cal. 5th 662 (2022) .......................................................................................10

*Brodsky v. Apple, Inc.*,
  445 F. Supp. 3d 110 (N.D. Cal. 2020)................................................................24

*Bruns et al v. TD Ameritrade, Inc.*,
  Case No. 3:22-cv-01369 (S.D. Cal. filed Sept. 11, 2022) ...................................17

*California Sch. Emps. Ass'n v. Kern Cmty. Coll. Dist.*,
  41 Cal. App. 4th 1003 (1996) ............................................................................12

*City of Oakland v. Lynch*,
  798 F.3d 1159 (9th Cir. 2015) ..............................................................................8

*Colony Cove Properties, LLC v. City Of Carson*,
  640 F.3d 948 (9th Cir. 2011) ..............................................................................18

*Cuenco v. Clubcorp USA, Inc.*,
  2021 WL 2453279 (S.D. Cal. June 16, 2021) ....................................................24

*Diamond Multimedia Systems, Inc. v. Superior Court*,
  19 Cal. 4th 1036 (1999) .....................................................................................20

*Dillon v. Trans Union, LLC*,
  Case No. 3:22-cv-01662 (S.D. Cal. filed Oct. 26, 2022) ...................................17

*Equilon Enterprises v. Consumer Cause, Inc.*,
  29 Cal. 4th 53 (2002) .........................................................................................13

*Fields v. Legacy Health Sys.*,
  413 F.3d 943 (9th Cir. 2005) ..............................................................................22

*Fox v. Ethicon Endo-Surgery, Inc.*,
  35 Cal. 4th 797 (2005)........................................................................................25

*Gladstone v. U.S. Bancorp*,
  811 F.3d 1133 (9th Cir. 2016) ............................................................................13

*Grafton Partners v. Superior Ct.*,
  36 Cal. 4th 944 (2005)........................................................................................11

*Heien v. North Carolina*,
  574 U.S. 54 (2014)..............................................................................................12

ii

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*Jergens, Inc. v. 5th Axis, Inc.*,
  2021 WL 1139417 (S.D. Cal Mar. 25, 2021) ..................................22-23

*Johnson v. Riverside Healthcare Sys., LP*,
  534 F.3d 1116 (9th Cir. 2008) ........................................................9-10

*Kearney v. Salomon Smith Barney, Inc.*,
  39 Cal. 4th 95 (2006) ..........................................................................21

*Laughead v. The Charles Schwab Corporation*,
  3:22-cv-01498 (S.D. Cal. filed Oct. 3, 2022) ....................................17

*Ludlow v. Flowers Foods, Inc.*,
  2021 WL 4460821 (S.D. Cal. Sept. 29, 2021)......................................23

*McCoy v. Alphabet, Inc.*,
  Case No. 20-cv-05427-SVK (N.D. Cal. Feb. 2, 2021).........................22

*Melchor et al v. Capital One Bank (USA), N.A.*,
  Case No. 3:22-cv-01371 (S.D. Cal. filed Sept. 11, 2022) ..................17

*Moore v. T. Rowe Price Retirement Plan Servs., Inc.*,
  Case No. 22-cv-01673 (S.D. Cal. filed Oct. 27, 2022)........................17

*Morrison v. Amway Corp.*,
  323 F.3d 920 (11th Cir. 2003) ...............................................................8

*Moss v. U.S. Secret Serv.*,
  572 F.3d 962 (9th Cir. 2009) .................................................................9

*Navarro v. Block*,
  250 F.3d 729 (9th Cir. 2001) .................................................................9

*Nedlloyd Lines B.V. v. Super. Ct.*,
  3 Cal. 4th 459 (1992)...........................................................................22

*Ortiz v. Vanguard Marketing Corp.*,
  Case No. 3:22-cv-01685 (S.D. Cal. filed Oct. 28, 2022) ...................17

*People v. Trevino*,
  26 Cal. 4th 237 (2001) .........................................................................19

*Russello v. United States*,
  464 U.S. 16 (1983).................................................................................19

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) ...........................................................7, 8

*Smith v. TD Bank, N.A.*,
  Case No. 3:22-cv-01370 (S.D. Cal. filed Sept. 11, 2022) ..................17

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)................................................................................8

*United States v. Corinthian Colls.*,
  655 F.3d 984 (9th Cir. 2011) ...........................................................5, 22

*United States v. Williams*,

iii

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

553 U.S. 285 (2008)...........................................................................................11

*Warth v. Seldin*,
  422 U.S. 490 (1975).........................................................................................8

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ........................................................................8

*Wilson v. Craver*,
  994 F.3d 1085 (9th Cir. 2021) ..................................................................17, 19

**Statutes**

Cal. Civ. Proc. Code § 340 ..............................................................................24

Cal. Penal Code § 637.3(a)........................................................................passim

Cal. Penal Code §§ 630-638 ............................................................................19

**Other Authorities**

California Invasion of Privacy Act, A.B. 860, Cal State Assemb. (1967)...............13

*Other*,
  Merriam-Webster, *available at* https://www.merriam-
  webster.com/dictionary/other (last visited Oct. 16, 2022) ...................11

Voice Stress Analyzers, A.B. 2798, Cal. State Assemb. (1978)............................13

**Rules**

Fed. R. Civ. P. 12(b)(1) ....................................................................................8

Fed. R. Civ. P. 12(b)(6)……………………………………………………………passim

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Fidelity's MyVoice® system protects Fidelity accountholders using cutting-edge biometric voice technology to verify an accountholder's identity whenever someone calls in seeking assistance with his or her account.[1]  MyVoice works by analyzing a combination of physical and behavioral voice patterns distinctive to each person to match the caller's voice to the unique "voiceprint" that Fidelity has on file for all accountholders who are enrolled in MyVoice.  Compl. ¶ 6.  Through MyVoice, Fidelity protects against identity theft and safeguards highly sensitive customer financial information, all using natural conversation, with no need for passwords or PINs.  Fidelity discloses its use of MyVoice to accountholders and allows them to opt out if they so desire.  *Id.* ¶ 25.

MyVoice's advanced voice-identification technology greatly enhances the security of Fidelity's customer accounts by identifying hundreds of fraudulent callers per month.  Nonetheless, Plaintiffs seek millions in statutory damages on the theory that Fidelity's use of MyVoice violates an obscure, decades-old provision of the California Penal Code designed to prevent the surreptitious use of voice-based lie detectors.  That statute provides:

> No person or entity in this state shall use any system which examines or records in any manner voice prints or other voice stress patterns of another person to determine the truth or falsity of statements made by such other person without his or her express written consent given in advance of the examination or recordation.

Cal. Penal Code § 637.3(a).  Plaintiffs assert in their Complaint, without any factual support, that MyVoice is "similar to a Polygraph Test," *id.* ¶ 35, and they claim that anytime Fidelity has used MyVoice without first obtaining express written consent

---

[1] Plaintiffs' claims are brought against Fidelity Brokerage Services LLC.  For ease of review, this memorandum will refer to Fidelity Brokerage Services LLC (along with any relevant affiliates) as "Fidelity," and it will refer to the Fidelity MyVoice® system as "MyVoice."

1    it has violated this provision of the Penal Code.

2        Plaintiffs' claim is baseless.  Section 637.3 does not and was never intended

3    to regulate voice-*identification* technology such as MyVoice.  Added to the

4    California Invasion of Privacy Act ("CIPA") in 1978, section 637.3 addressed

5    legislators' concerns about unreliable handheld "voice stress analyzers" that

6    purported to detect lies based on the stress patterns in a speaker's voice.  Consistent

7    with that exclusive legislative focus, the statute's text regulates the analysis of

8    "voice prints *or other voice stress patterns* ... to determine the truth or falsity of

9    statements."  By its plain text, the statute's reference to "*other* voice stress patterns"

10   demonstrates that the statute regulates "voice prints" only as a kind of "voice stress

11   pattern" for purposes of lie detection.  This plain textual reading is also supported

12   by contemporaneous legislative history, which makes clear that the statute targets

13   the use of "a psychological stress evaluator to analyze voice prints or other voice

14   stress patterns."  Edwards Decl., Ex. B.  The statute was not designed to—and does

15   not—restrict the type of voice-identification technology at issue here.

16       Recognizing the mismatch between Fidelity's MyVoice technology and the

17   conduct that the statute prohibits, Plaintiffs strain to recast MyVoice as a lie

18   detector, asserting that it is "similar" to a polygraph and that it detects lies based on

19   various behavioral and linguistic cues.  *See* Compl. ¶¶ 33-35.  But those conclusory

20   allegations lack the factual support required for plausibility.  To the contrary, they

21   are directly contradicted by both the Complaint's more detailed factual allegations

22   and by the MyVoice FAQs on which the Complaint is based, each of which makes

23   clear that MyVoice uses fixed voiceprints to *identify* callers rather than using

24   situational cues such as voice stress patterns to detect lies.  Because section 637.3

25   does not regulate the type of voiceprints that Fidelity uses for identification

26   purposes, Plaintiffs' claim must be dismissed.

27       Beyond this fundamental flaw, Plaintiffs' claim also fails for several other

28   reasons:

1        First, Plaintiffs' claim fails because section 637.3 only prohibits conduct
2   occurring "in this state," and Plaintiffs do not—and could not—allege that the
3   Fidelity personnel, servers, and systems that operate MyVoice are located in
4   California.

5        Second, Plaintiff Balanzar's claim fails because she has not suffered any
6   concrete injury to her legal rights, as required for standing under Article III (and
7   under the statute at issue).  Balanzar has not spoken on the phone with Fidelity
8   since at least 2005, and, as a result, she has never been enrolled in MyVoice, and
9   Fidelity has never taken her voiceprint.  Because Balanzar is not among the group
10  of people that Fidelity has allegedly injured through its use of MyVoice, her claim
11  must be dismissed under Rule 12(b)(1).

12       Third, while Plaintiff Lahr has enrolled in MyVoice, her claim fails under
13  Rule 12(b)(6) because the customer account agreement that she entered into with
14  Fidelity and that is incorporated by reference into the Complaint (1) includes a
15  choice-of-law provision dictating that Massachusetts law—and not California
16  law—governs this dispute; and (2) provides Lahr's express written consent to
17  Fidelity's use of MyVoice.

18                              *        *        *

19       This case is one of eight virtually identical lawsuits filed by Plaintiffs'
20  counsel against various financial services firms in the past two months, challenging
21  their use of biometric voiceprint technology to prevent fraud and theft.  Through
22  these filings, Plaintiffs' counsel seeks to contort defendants' protective conduct to
23  bring it within the scope of a rarely invoked statute designed to prohibit something
24  else entirely, all in the hopes of receiving a windfall through statutory damages, and
25  all without regard for the protections that biometric voice-identification technology
26  affords to the very accountholders on whose behalf they purport to sue.  These
27  efforts should be stopped in their tracks.  Plaintiffs' Complaint should be dismissed.

28

## BACKGROUND

### A.   Fidelity and Its MyVoice Customer Protection Feature

Fidelity Brokerage Services LLC (together with relevant affiliates, "Fidelity") is a broker-dealer that, among other things, offers customers who open a brokerage account at Fidelity access to a wide array of investment products and services. *See* Compl. ¶ 14; Declaration of Diane Brown, Ex. 2. Unsurprisingly, Fidelity's accountholders regularly call Fidelity to inquire about their accounts or their investments, to open new accounts or change investments, or to ask other questions related to Fidelity's services. *See, e.g.*, Compl. ¶ 44.

In 2017, in the face of rising consumer fraud and identity theft, Fidelity implemented a voice-identification technology, MyVoice, to match a caller's voice to a voiceprint Fidelity keeps on file for the holder of the account that is the subject of the call. Compl. ¶¶ 24, 25; Declaration of Randall W. Edwards, Ex. A. Fidelity's launch of MyVoice made it one of the first financial institutions to employ advanced biometric technology to protect customers' information and accounts. Compl. ¶¶ 24, 25; Edwards Decl., Ex. A. According to the Complaint, MyVoice "detects and verifies" a customer's identity by creating a biometric voiceprint—a mix of physical and behavioral voice characteristics that functions as a digitally-encrypted representation of a person's voice. Compl. ¶¶ 5, 34. MyVoice matches an incoming caller's voice to a voiceprint on file using natural conversation; it does not require a customer to utter any specific phrase. *See* Edwards Decl., Ex. A at 4. This biometric voiceprint technology is beneficial not only because it spares customers from tracking and entering passwords, but also because voiceprints are particularly secure—like fingerprints, they are unique to each individual customer and cannot be copied or faked. Compl. ¶ 6; Edwards Decl., Ex. A at 4.

Fidelity's brokerage accountholders agree to the use of this biometric voiceprint technology in their customer account agreements. *See* Compl. ¶¶ 27, 29;

Brown Decl., Ex. 1 at 6.[2]  The customer account agreements specifically authorize Fidelity to "record any phone conversations with" the accountholder and to "create a digital representation of [their] voice, a 'voiceprint,' that may be used for verifying [their] identity when [] contact[ing] Fidelity."  Brown Decl., Ex. 1 at 6. The agreements also include a provision describing MyVoice:

> Fidelity MyVoice is a free security service. When you call Fidelity, you'll no longer have to enter PINs or passwords because Fidelity MyVoice helps you interact with us securely and more conveniently. Through natural conversation, MyVoice will detect and verify your voiceprint in the first few moments of the call. A voiceprint is a combination of your physical and behavioral voice patterns. Like a fingerprint, it's unique to you.

Brown Decl., Ex. 1 at 9.

According to the Complaint, Fidelity's website began "touting its use of MyVoice" "around May of 2018," including through the publication of detailed FAQs about MyVoice that the Complaint relies on and quotes from extensively. *See United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011); Compl. ¶¶ 5, 6,10, 26.  The FAQs explain Fidelity's MyVoice program, how voiceprints work, and the enrollment and unenrollment process.  *See* Compl. ¶ 10; Edwards Decl., Ex. A.  Plaintiffs allege, and the MyVoice FAQs explain, that Fidelity customers enroll in MyVoice "verbally over the phone" and that, upon enrollment, MyVoice will create a voiceprint for that customer that consists of "a set of characteristics associated with your unique voice pattern" that is then "saved and will be used to verify your identity when you call us."  *See* Compl. ¶¶ 6, 10; Edwards Decl., Ex. A at 5-6.  On future calls, purely "through natural conversation, MyVoice will detect and verify your voiceprint in the first few moments of the

---

[2] Fidelity is entitled to rely on provisions in the account agreements for purposes of this motion because these agreements are incorporated into the Complaint by reference.  *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011). *See infra* II.D.

1    call." *Id.* at 4.  Fidelity also notifies customers that they have the right to opt out of

2    MyVoice at any time: "Call us at any time and let us know what you'd like to do."

3    *See id.*; Compl ¶ 25.

### B.   Plaintiffs' Conclusory and Unsupported Allegation that MyVoice Is a Polygraph Test

6        While the factual allegations in the Complaint establish that MyVoice is used

7    to verify a caller's identity, the Complaint also contains conclusory (and

8    contradictory) allegations that MyVoice functions "very similar[ly] to a

9    Polygraph," *id.* ¶ 34, by measuring behavior tendencies used to determine whether

10   someone is lying, such as "(1) change in breathing (2) repeating words or phrases

11   (3) difficulty speaking (4) change in speech patterns (5) unusual rise or fall in vocal

12   tone (6) odd inflection (7) context of use of contractions (8) lack of use of personal

13   pronouns (9) using a high-pitched voice (10) sudden change of volume (11) using

14   phrases such as 'I want to be honest with you,' 'honestly' or 'let me tell you the

15   truth' (12) using words such as 'uh,' 'like' and 'um' and (13) slip-ups and

16   corrections that can indicate a caller is not being truthful." *Id.* ¶ 33.  Plaintiffs do

17   not attempt to reconcile these allegations with their descriptions of MyVoice as a

18   biometric voice-identification technology, or with the MyVoice FAQs on which

19   they base their Complaint, which describe Fidelity MyVoice solely as a means of

20   caller identification.

### C.   Plaintiffs

22       Plaintiffs Balanzar and Lahr allege that they are Fidelity customers who

23   reside in California.  Balanzar alleges that she became a Fidelity customer in 2005,

24   and Lahr alleges that she became a Fidelity customer in 2017.  Compl. ¶¶ 37, 38.

25   Although Plaintiffs both allege that they have called Fidelity "on numerous

26   occasions," they do not identify the date or time of any of those calls, nor their

27   location when the calls were placed.  *See id.* ¶¶ 39, 44.  Plaintiffs further allege that

28   Fidelity uses MyVoice to confirm their identities when they call, and that they did

1    not provide written consent for Fidelity to use MyVoice.  *Id*. ¶¶ 43-44.[3]

2         These allegations are unfounded.[4]  In fact, Fidelity has no record of Plaintiff

3    Balanzar having called Fidelity or otherwise spoken with a Fidelity representative

4    via phone since at least 2005.  Brown Decl. ¶ 9.  As a result, Plaintiff Balanzar has

5    never been enrolled in Fidelity MyVoice, and Fidelity has never taken her

6    voiceprint.  *Id*. ¶ 8.  And, despite her allegations to the contrary, Plaintiff Lahr

7    provided Fidelity with express written consent to take her voiceprint on November

8    25, 2020, when she electronically acknowledged and accepted a Fidelity customer

9    account agreement that describes MyVoice and expressly authorizes Fidelity to

10   "create a digital representation of [her] voice, a 'voiceprint,' that may be used for

11   verifying [her] identity when [] contact[ing] Fidelity."  *Id.* ¶ 10.

12        Plaintiffs brought this lawsuit in September 2022, alleging one cause of

13   action for violation of California Penal Code section 637.3.

14

15

16

17

---

18   [3] Despite (1) Plaintiffs' reliance on the MyVoice FAQs, which they concede have

19   been available on Fidelity's website since at least 2018, (2) their citation to
     Fidelity's "terms and conditions," which they concede have disclosed Fidelity's use

20   of MyVoice since at least January 2021, and (3) their reference to numerous media
     articles and public blog posts about MyVoice, *see, e.g.,* Compl. ¶¶ 5-6, 24-27, 29,

21   the Complaint also includes conclusory allegations that Plaintiffs "did not know
     (and had no way of knowing)" that their voices were "recorded for purposes of

22   creating voice prints" because Fidelity "kept this information secret." *Id*. ¶ 46.

23
     [4] While Fidelity must accept Plaintiffs' allegations of fact as true for purposes of its

24   motion to dismiss under Rule 12(b)(6), Fidelity is entitled to bring in facts outside

25   of the Complaint to support its motion to dismiss Balanzar's claim for lack of
     standing under Rule 12(b)(1). *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039

26   (9th Cir. 2004).  And, as noted above, Fidelity is entitled to rely on Ms. Lahr's
     account agreements, which are incorporated into the Complaint by reference.  *See*

27   *supra* n.2.

28

1

## **ARGUMENT**

2

**I.   AS A THRESHOLD MATTER, PLAINTIFF BALANZAR LACKS CONSTITUTIONAL STANDING TO BRING HER CLAIM.**

3

4

    **A.   Courts can consider evidence on a Rule 12(b)(1) motion to dismiss for lack of standing.**

5

        Whether a plaintiff has Article III standing is a "threshold question in every

6

federal case," *Warth v. Seldin*, 422 U.S. 490, 498 (1975), because a lack of standing

7

deprives courts of subject matter jurisdiction, *City of Oakland v. Lynch*, 798 F.3d

8

1159, 1163 (9th Cir. 2015).  To establish standing, a plaintiff must show that:

9

(1) she has suffered an injury in fact that is concrete and particularized, and actual

10

or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the

11

injury is likely to be redressed by a favorable court decision.  *Spokeo, Inc. v.*

12

*Robins*, 578 U.S. 330, 338 (2016).

13

        Plaintiff bears the burden of establishing standing.  *Id.*  Under Federal Rule

14

of Civil Procedure 12(b)(1), a defendant can mount either a facial or a factual

15

challenge to this Court's subject-matter jurisdiction at the pleadings stage.  *White v.*

16

*Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  A factual attack on jurisdiction can

17

dispute the truth of allegations that on their face would suffice to confer federal

18

jurisdiction.  *Morrison v. Amway Corp.*, 323 F.3d 920, 930 (11th Cir. 2003).

19

        In resolving such a factual attack, the court need not presume the truthfulness

20

of the plaintiff's allegations.  *Safe Air for Everyone*, 373 F.3d at 1039.  Instead, the

21

court may review evidence beyond the complaint without converting the motion to

22

dismiss into a motion for summary judgment.  *Id.*  A plaintiff opposing such an

23

evidentiary challenge "must furnish affidavits or other evidence necessary to satisfy

24

its burden of establishing subject matter jurisdiction."  *Id.*

25

    **B.   Plaintiff Balanzar lacks standing because she has never been enrolled in MyVoice.**

26

27

        Plaintiff Balanzar lacks standing to bring her section 637.3 claim because she

28

has not been subjected to the challenged conduct—the use of her voiceprint by

-8-

Fidelity without her express written consent.  While the Complaint alleges that "[o]ver the years, Plaintiffs have called Defendant on numerous occasions," Compl. ¶ 39, in fact, Balanzar has not called Fidelity or spoken with a Fidelity representative by phone since at least 2005—long before Fidelity is alleged to have implemented the voiceprint technology at issue.  *See* Brown Decl. ¶ 9; Compl. ¶ 40.  As a result, Balanzar has never been enrolled in MyVoice, and Fidelity has never made any kind of voiceprint or other digital representation of her voice.  Brown Decl. ¶ 8.

Having never been subjected to the challenged conduct, Plaintiff Balanzar lacks the concrete injury required for standing under Article III.  (And, for this same reason, she also lacks statutory standing to bring her claim under Penal Code section 637.3(c), which entitles one to bring such a claim only if she has been "injured" by the alleged violation).

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER CALIFORNIA LAW.

### A.   Standard for dismissal under Rule 12(b)(6)

Dismissal under Rule 12(b)(6) is proper where there is "no cognizable legal theory" or "an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).  Although the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the non-moving party, it must dismiss any claim that fails to "allege sufficient facts to state the elements of [a] claim." *Johnson v. Riverside Healthcare Sys., LP*,

1    534 F.3d 1116, 1123 (9th Cir. 2008).

2         **B.**     **Plaintiffs fail to state a claim under section 637.3 because they do**

3                   **not plausibly allege that Fidelity analyzed voice stress patterns for lie detection.**

4         First and foremost, the Complaint fails to state a claim because Penal Code

5    section 637.3 does not regulate the use of biometric voiceprints for purposes of

6    customer identification.  The plain language of section 637.3 proscribes the analysis

7    of "voice stress patterns" for the narrow purpose of determining "the truth or

8    falsity" of a speaker's statements (absent express written consent).  Cal. Penal Code

9    § 637.3(a).  It does not generally bar the use of voice-based biometric technology,

10   nor does it specifically bar the use of voiceprints to determine a speaker's identity.

11   There is, therefore, a disconnect between the narrow statutory prohibition in section

12   637.3 and Fidelity's alleged conduct.

13        In analyzing a statute's scope, a court's "fundamental task ... is to determine

14   the Legislature's intent so as to effectuate the law's purpose." *Brennon B. v.*

15   *Superior Ct.*, 13 Cal. 5th 662, 673 (2022).  A court must "first examine the statutory

16   language, giving it a plain and commonsense meaning.... If the language is clear,

17   courts must generally follow its plain meaning unless a literal interpretation would

18   result in absurd consequences the Legislature did not intend." *Id.*  If the "statutory

19   language permits more than one reasonable interpretation, courts may consider

20   other aids, such as the statute's purpose, legislative history, and public policy." *Id.*

21        Here, both the statute's plain text and its legislative history foreclose

22   Plaintiffs' attempt to regulate the use of voiceprint technology for personal

23   identification.  California's Legislature enacted section 637.3 in the late 1970s in

24   response to press reports about handheld voice stress analyzers then being marketed

25   to private citizens as amateur lie-detection devices.  Consistent with that focus, the

26   statute's plain text regulates "voice prints" only to the extent they constitute "voice

27   stress patterns" used to "determine the truth or falsity of statements"—not in their

28   capacity as personal identifiers.  Cal. Penal Code § 637.3(a).  Plaintiffs do not

plausibly allege that Fidelity used MyVoice to analyze "voice stress patterns" to determine the truth or falsity of any statement. Their claim under section 637.3 therefore fails as a matter of law.

> 1.   The plain text of section 637.3 regulates "voice prints" only to the extent they are recorded or analyzed as "voice stress patterns" for lie detection.

The plain language of section 637.3 regulates the "examin[ation] or record[ing]" of voiceprints only as "voice stress patterns" and for a specific purpose: to "determine the truth or falsity of statements." The factual allegations in the Complaint, in contrast, say that Fidelity used voiceprints ***as a means of identification***, which is different. The Complaint does not plausibly allege any facts that would establish that Fidelity used voiceprints to examine voice stress patterns or that it did so for the purpose of detecting lies. The Complaint therefore fails to state a claim under the statute.

The scope of the statute is limited to analysis of voice stress patterns. Section 637.3 requires written consent before recording or examining an individual's "voice prints or other voice stress patterns" to "determine the truth or falsity of statements." *Id.* Under the associated-words canon (*noscitur a sociis*), the meaning of the phrase "voice prints" is "given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008); *see also Grafton Partners v. Superior Ct.*, 36 Cal. 4th 944, 960 (2005). That includes the phrase that immediately follows: "***or other*** voice stress patterns." The adjective "other," meaning "additional" or "different," implies that the preceding phrase, "voice print," refers to one type of "voice stress pattern." *Other*, Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/other (last visited Oct. 16, 2022). The dictionary definition accords with common sense: it would defy logic for the Legislature to refer to "other voice stress patterns" unless it intended "voice prints" to describe a kind of "voice stress pattern." The phrase "other voice stress patterns" thus confirms that

the Legislature sought to regulate voiceprints in a single, limited capacity—to detect lies based on voice stress patterns, as various devices purported to do when the statute was enacted.  It did not limit the use of voiceprints in other capacities and for other purposes, such as personal identification.

The Supreme Court's decision in *Heien v. North Carolina*, 574 U.S. 54, 67–68 (2014)—a Fourth Amendment case involving a traffic stop over a single working brake light—further illustrates the point.  At issue in *Heien* was a North Carolina statute stating that a car's "stop lamp may be incorporated into a unit with one or more ***other rear lamps***."  *Id.*  (emphasis added).  The court concluded that the "use of 'other' suggests to the everyday reader of English that a 'stop lamp' is a type of 'rear lamp.'"  *Id.*  Just so here: the word "other" demonstrates that, as used in section 637.3, a "voice print" is a type of voice stress pattern.  That "plain and commonsense meaning" controls this case and precludes Plaintiffs' attempt to extend section 637.3 to voice-matching technologies that do not assess voice stress patterns for purposes of lie detection.

This reading of "voice print" also harmonizes with "the context of the statutory framework as a whole."  *See California Sch. Emps. Ass'n v. Kern Cmty. Coll. Dist*., 41 Cal. App. 4th 1003, 1011 (1996).  The statute prohibits the use of voiceprints (and other voice stress patterns) for one purpose: "to determine the truth or falsity of statements."  Cal. Penal Code § 637.3(a).  The phrase "to determine the truth or falsity of statements" expressly limits the circumstances in which the analysis of voiceprints and other voice stress patterns are covered by the statute.  If voiceprints and other voice stress patterns are analyzed for other purposes, the statute does not apply by its own terms.  As explained below, that narrow statutory purpose aligns with the Legislature's objective to regulate the use of dubious lie-detection devices popular in the late 1970s.  More importantly, this statutory language cements the understanding that section 637.3 regulates voiceprints in their capacity as "voice stress patterns" used for lie detection and not as tools for

1  personal identification.

2             2.    Section 637.3's legislative history confirms the statute does not
3                   regulate the use of voiceprints for personal identification.

4          Although the plain textual limits on section 637.3 mean that this Court need

5  not consult the statute's legislative history, *Gladstone v. U.S. Bancorp*, 811 F.3d

6  1133, 1138 (9th Cir. 2016), the "available legislative history buttresses [the]

7  conclusion" that the phrase "voice prints and other voice stress patterns" does not

8  regulate the use of voiceprints as a means of personal identification.  *Equilon*

9  *Enterprises v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 61 (2002).  The comments of

10 legislators and staff members about section 637.3 evince a singular objective to

11 regulate voice stress analysis as a pseudoscientific lie-detection technology.  Not

12 one word of the legislative record discloses an intent to restrict the use of

13 voiceprints for personal identification.

14         Section 637.3 was a late addition to CIPA, added in 1978, eleven years after

15 CIPA's original 1967 enactment.  *See* Voice Stress Analyzers, A.B. 2798, Cal.

16 State Assemb. (1978); California Invasion of Privacy Act, A.B. 860, Cal State

17 Assemb. (1967).  The bill's title ("Voice Stress Analyzers") reflects a concern with

18 news reports at the time—including articles in the files of the Assembly Republican

19 Caucus—documenting the increased adoption of handheld lie-detection

20 technologies that purported to analyze voice stress patterns to determine whether

21 someone was telling the truth or not.  *See, e.g.*, Edwards Decl., Ex. B, Legislative

22 History, California Assembly Bill 2798 (1978), at 33 ("Who Knows? The Hagoth

23 Knows!" news article); *id*. at 34 ("Close Encounters of a Fourth Kind" news

24 article).  In a letter urging Governor Brown to sign AB 2798, the bill's sponsor,

25 Assemblyman Lehman, explained that the bill was necessary because "[t]here must

26 be strict statutes regarding the use of these modified lie detectors by private

27 citizens."  *Id.*, Ex. B, Legislative History, California Assembly Bill 2798 (1978), at

28 22 (Lehman's letter to Governor Brown dated August 31, 1978).  Lehman

continued:

> A hand-held voice analyzer about the size of a pocket calculator can be an extremely effective law enforcement tool, but people should not have to worry every time they start conversations that their voices may be recorded for future use against them.
>
> Because of the fact that there are no current regulations for these modified lie detectors, the equipment is being used by amat[eur]s without prior consent from the people they record and analyze.  This is a clear invasion of privacy and a dangerous precedent."

*Id.*

The same focus on stress evaluation and lie detection is apparent in the Enrolled Bill Memorandum for AB 2798, which observed that voice-based lie detectors threatened coercion in employment settings and that the bill sought to regulate ***voice stress analysis***—not the analysis or use of voiceprints more generally:

> Existing law prohibits employers from demanding or requiring that any employee or any applicant … submit to or take a test involving psychological stress evaluators, including polygraphs, lie detectors or similar tests or examinations, as a condition of employment … but does not prohibit employers or others from ***utilizing a psychological stress evaluator to analyze voice prints or other voice stress patterns*** of a person to determine the truth or falsity of statements made by such person….

*Id.* at 17 (emphasis added).

In the same vein, a Senate Committee on the Judiciary memo voiced concern about the "use of psychological stress evaluators to analyze voice prints," explaining that such devices "have been used in the same manner as polygraphs" and highlighting expert testimony that such "analyzer[s] cannot differentiate between stress resulting from lying and that resulting from some other cause."  *Id.* at 37-38.  The memo summarized:  "The purpose of the bill is to limit the abuse of voice stress analyzers."  *Id.* at 37.  When ultimately codified in September 1978, AB 2978 was entitled "Voice Stress Analyzers," and described as "[a]n act to add

Section 637.3 to the Penal Code, relating to voice stress analyzers." *Id*. at 12.

These are just some of many examples from the legislative history whose exclusive focus is the use of voice stress analysis as a lie detection technology.[5] Not one word of that legislative history suggests an intent to regulate voiceprints as an identification technology.

The legislative history's single-minded focus confirms the most logical reading of the statutory text as regulating the examination of "voice prints or other voice stress patterns … to determine the truth or falsity of statements."  Cal. Penal Code § 637.3(a).  By its straightforward terms, the statute regulates the use of voiceprints in their capacity as "voice stress patterns" analyzed for lie detection— or, as multiple legislative memoranda put it in 1978, the use of "a psychological stress evaluator to analyze voice prints" for lie detection.  Edwards Decl., Ex. B. at 20.  Indeed, Plaintiffs acknowledge the Legislature's intent to regulate lie-detection technology, asserting that "California chose to regulate" systems "very similar to a Polygraph Test."  Compl. ¶ 34.

> 3.   The Complaint does not plausibly allege that Fidelity records or examines voice stress patterns for purposes of lie detection.

Plaintiffs fail to allege facts plausibly establishing that Fidelity recorded or examined voiceprints as a means of voice stress analysis for lie detection.  On the contrary, the Complaint's only non-conclusory allegations—confirmed by the MyVoice FAQs on which the Complaint is largely based, *see infra* Background—

_____

[5] *See also, e.g.*, Edwards Decl., Ex. B at 19 (Agriculture & Services Enrolled Bill Report ("Would prohibit the use of systems that interpret the human voice in such a way as to act as a lie detector…."));  *id*. at 49 (Senate Democratic Caucus Memorandum ("Subject: Voice Stress Analyzers ….. Existing law … does not prohibit employers or others from utilizing a psychological stress evaluator to analyze voice prints"));  *id*. at 21 (Department of Finance Enrolled Bill Report ("requires written consent before voice stress analysis may be used"));  *id*. at 58 (Mandated Cost Estimate ("TITLE: Use of Voice Stress Analyzers"));  *id*. at 35 (Ways and Means Staff Analysis ("Subject: Voice Stress Analyzer")).

1  show that Fidelity's MyVoice is an identity-verification tool beyond the scope of

2  section 637.3.  *See, e.g.*, Compl. ¶¶ 5, 6, 20, 43 (alleging Fidelity examines

3  voiceprints to "determine the true identity of Plaintiffs").

4          Plaintiffs oscillate between plausibly alleging that MyVoice is a biometric

5  identification tool and alleging in conclusory terms that it is also a lie-detection

6  technology based on voice stress patterns.  Plaintiffs state that MyVoice records

7  "biometric voice prints," *id.* ¶ 1, and allows Fidelity to "authenticate or refute the

8  true identity of callers" using "voice recognition software that creates a biometric

9  voiceprint of each caller." *Id.* ¶ 3.  Plaintiffs quote at length from the MyVoice

10 FAQs, which describe MyVoice as a system to "detect and verify your voiceprint in

11 the first few moments of the call" and explain that a "voiceprint is a combination of

12 your physical and behavioral voice patterns … a set of characteristics associated

13 with your unique voice pattern.  This pattern is saved and used to verify your

14 identity when you call us." *Id.* ¶ 5.  "Creating a voice print," Plaintiffs allege,

15 "requires extracting an individual's phonetic features (including their unique speech

16 patterns, tones, and other characteristics) from their voice.  As such, a voice print

17 serves as an audible 'fingerprint' which can directly identify an individual and can

18 even reveal the speaker's behavioral traits." *Id.* ¶ 20.

19         Recognizing that such allegations cannot establish a violation of

20 section 637.3, Plaintiffs add contradictory and conclusory assertions that MyVoice

21 is in fact a lie-detection technology that uses voice stress patterns to determine the

22 truth or falsity of statements.  More specifically, they allege that "Defendant

23 determines the truth or falsity of caller statements . . . by examining patterns" for

24 "known audible indications of lying such as (1) change in breathing (2) repeating

25 words or phrases (3) difficulty speaking (4) change in speech patterns (5) unusual

26 rise or fall in vocal tone (6) odd inflection (7) context of use of contractions (8) lack

27 of use of personal pronouns (9) using a high-pitched voice (10) sudden change of

28 volume (11) using phrases such as 'I want to be honest with you,' 'honestly' or 'let

me tell you the truth' (12) using words such as 'uh,' 'like' and 'um' and (13) slip-ups and corrections that can indicate a caller is not being truthful." *Id.* ¶ 33. This same allegation appears verbatim in all eight of the complaints Plaintiffs' counsel has recently filed against financial service firms alleging violations of section 637.3,[6] and it seems to be plucked from popular websites purporting to advise readers on behavioral and linguistic indicia of dishonesty. *See id.* at 7 nn.10-12.

For two reasons, these allegations do not state a violation of section 637.3 but are instead "legal conclusions couched as factual allegations" that this Court cannot accept as true. *Wilson v. Craver*, 994 F.3d 1085, 1090 (9th Cir. 2021).

First, Plaintiffs do not allege a single statement as to which MyVoice determines any truth or falsity. The closest they come is to imply that Fidelity uses MyVoice to determine the truth or falsity of callers' self-identification. Compl. ¶¶ 3, 43. Even if that suggestion were substantiated by plausible factual allegations, it would not state a violation of section 637.3 because confirming identity based on biometrics is not a form of lie detection based on analysis of voice stress patterns. But, in any event, the Complaint nowhere suggests that Fidelity requires all callers—or required Plaintiffs—to make self-identifying statements at all for MyVoice to function, much less that MyVoice recognizes the substance of a statement (so as to determine truth or falsity) as opposed to recognizing the

---

[6] *See Allen v. Bank of America, N.A.,* Case No. 3:22-cv-01368 (S.D. Cal. filed Sept. 11, 2022); *Bruns et al v. TD Ameritrade, Inc*., Case No. 3:22-cv-01369 (S.D. Cal. filed Sept. 11, 2022); *Smith v. TD Bank, N.A*., Case No. 3:22-cv-01370 (S.D. Cal. filed Sept. 11, 2022); *Melchor et al v. Capital One Bank (USA), N.A*., Case No. 3:22-cv-01371 (S.D. Cal. filed Sept. 11, 2022); *Laughead v. The Charles Schwab Corporation*, 3:22-cv-01498 (S.D. Cal. filed Oct. 3, 2022); *Dillon v. Trans Union, LLC*, Case No. 3:22-cv-01662 (S.D. Cal. filed Oct. 26, 2022); *Moore v. T. Rowe Price Retirement Plan Servs., Inc.*, Case No. 22-cv-01673 (S.D. Cal. filed Oct. 27, 2022); *Ortiz v. Vanguard Marketing Corp.*, Case No. 3:22-cv-01685 (S.D. Cal. filed Oct. 28, 2022). In addition to bringing this case against Fidelity, Plaintiff Lahr as also serves as a named plaintiff in two of these copycat cases: *Melchor* and *Moore*.

biometric properties of the speaker's voice regardless of the content of the speaker's words.  Indeed, by Plaintiffs' own account, MyVoice operates without regard to the content of a caller's speech: Plaintiffs allege that MyVoice determines identity based on biometric features, not semantic content.  *Id.* ¶ 20.  On the face of the Complaint, it is equally plausible that MyVoice confirms callers' identities based on small talk about local weather as it is that MyVoice analyzes callers' self-identifying statements.  *Twombly*, 550 U.S. at 557 (allegations "must be placed in a context that raises a suggestion" of illegality "not merely … conduct that could just as well be" lawful).[7]

Second, Plaintiffs' threadbare assertions that MyVoice operates as a lie-detection technology are directly contradicted by both their factual allegations elsewhere in the Complaint and the Fidelity documents on which the Complaint is based.  The Complaint contains conclusory allegations that MyVoice "is very similar to a Polygraph Test," Compl. ¶ 35, generates voiceprints based on "stress patterns," *id.* ¶ 32, and analyzes behavioral cues such as "change in breathing," "repeating words or phrases," or "phrases such as 'I want to be honest with you.'" *Id.* ¶ 33.  But those conclusory allegations cannot be squared with Plaintiffs' own detailed allegations or the MyVoice FAQs upon which the Complaint heavily relies, which explain that MyVoice measures fixed biometric properties, not shifting behavioral traits such as stress or speech patterns.  *See, e.g.*, Compl. ¶¶ 3-6. The Court should not credit implausible allegations directly at odds with Plaintiffs' own description of MyVoice and "contradicted by documents referred to in the Complaint." *Colony Cove Properties, LLC v. City Of Carson*, 640 F.3d 948, 957 (9th Cir. 2011).

---

[7] Were this case to proceed to discovery, the evidence would confirm that MyVoice is entirely agnostic as to the substance of the statements used to create and match voiceprints; there is no need for a caller to identify themselves in order for MyVoice to work.

The Complaint provides no plausible basis for questioning that MyVoice is exactly what the MyVoice FAQs and Fidelity customer account agreements say it is—a biometric tool to verify a caller's identity. The Complaint's mere recitation of the legal element—analysis of voice stress patterns to determine the truth or falsity of some unspecified statement—is not sufficient to state a claim. Merely alleging an apple is an orange does not make it so. *See, e.g., Wilson,* 994 F.3d at 1090 (conclusory statements cannot withstand motion to dismiss).

**C.    Plaintiffs fail to state a claim under section 637.3 because they do not plausibly allege that any recording or examination of a voice stress pattern occurred in California.**

Plaintiffs' claim also fails because they do not allege that Fidelity's recording or examination of voice stress patterns took place in California. By its express terms, the statute requires that the proscribed conduct must occur "in this state," i.e., California:

> No person or entity ***in this state*** shall use any system which examines or records in any manner voice prints or other voice stress patterns of another person to determine the truth or falsity of statements made by such other person without his or her express written consent given in advance of the examination or recordation.

Cal. Penal Code § 637.3(a). Almost all other provisions of CIPA lack comparable limiting language. *See id.* §§ 630-638. The inclusion of a geographic qualifier in section 637.3 that is absent in most other CIPA provisions evidences a legislative intent to limit the section's geographic reach to conduct occurring in California. *See People v. Trevino*, 26 Cal. 4th 237, 242 (2001) ("When the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a difference in meaning."); *Russello v. United States*, 464 U.S. 16, 23 (1983) (where legislature "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed [it] acts intentionally and purposely in the disparate inclusion or exclusion"). The plain meaning of the

statute's phrasing—"in this state"—limits its reach to California-based activity.

This conclusion is confirmed by the California Supreme Court, which has interpreted virtually identical statutory language to require that the defendant's relevant conduct occur in California. *See Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal. 4th 1036 (1999). The *Diamond* case involved a California statute making it "unlawful for any person, directly or indirectly, *in this state*" to engage in certain acts of securities-market manipulation, including making untrue statements of material facts to induce a purchase or sale of a security. *Id*. at 1042. Describing this language as "very clear," the Court held that the phrase "in this state" required that the "***unlawful statement … is made in this state***," or "willfully disseminated" here, because the phrase "in this state … prohibits commission of manipulative acts ***in California***." *Id.* at 1048, 1052 (emphasis added).

The conduct regulated by section 637.3 is the "use" of "any system which examines or records … voice prints or other voice stress patterns … to determine the truth or falsity of statements." Cal. Penal Code § 637.3(a). But the Complaint does not—and could not—allege that Fidelity's "use" of MyVoice—i.e., its examination or recording of voice stress patterns—occurred in California.[8]

To be sure, Plaintiffs do allege some things about California, but they are not allegations sufficient to trigger statutory coverage. More specifically, Plaintiffs allege that Fidelity has customer branch locations in California, Compl. ¶ 14 & n.3, and that Fidelity used the MyVoice system to verify the identities of customers who reside in California, *id*. ¶ 12. But unless Fidelity operated the MyVoice system itself in California, any recording or examination of California customers' voices would amount to "a multistate event" of which just one component—"the …

---

[8] Were this case to proceed to discovery, the evidence would show that Fidelity does not examine or record voice stress patterns in California, because the personnel, servers, and systems that Fidelity uses to operate MyVoice are all located elsewhere.

communication by the California resident—occurred **in California**."  *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 119 (2006).  The use of any recording and examination system, by contrast, would remain "outside the state."  *Id.*  And because the statutory language expressly focuses on the location of the alleged violation, and not the speaker's location, Plaintiffs' failure to allege that Fidelity's operation of the MyVoice system occurred "in this state" is fatal to their claim.

    **D.**    **Plaintiff Lahr's CIPA claim fails because she entered into a written agreement that applies Massachusetts law to this dispute and expressly consents to the use of MyVoice.**

       The customer account agreement (or the "terms and conditions") that the Complaint incorporates by reference requires dismissal of Plaintiff Lahr's claim for two additional reasons.[9]  First, the agreement includes a Massachusetts choice-of-law provision that precludes Lahr's claim under CIPA.  Second, in accepting that agreement, Lahr gave express written consent to Fidelity's use of MyVoice.

       The Complaint repeatedly refers to and necessarily relies on Plaintiff Lahr's customer account agreements with Fidelity (including references in those agreements to MyVoice).  *See, e.g.*, Compl. ¶¶ 23, 27-31.  These documents go to the heart of Lahr's claim—i.e., whether Fidelity obtained her express written consent to the use of MyVoice.  *See, e.g.*, Compl. ¶ 28 (alleging Fidelity used MyVoice from 2017 to January 2021 "without disclosing it in its terms and conditions"); *id* ¶ 27 (alleging Fidelity did not add a MyVoice provision to its terms and conditions until January 2021); *id* ¶ 29 (alleging Fidelity sent a Notice of Change of Terms to customers in January 2021 "to enable it to use MyVoice…legally"); *id* ¶¶ 30-31 (alleging that none of the preceding qualifies as express written consent and Plaintiffs were unaware of the terms).  As a result,

---

[9] This section of the motion is focused on Plaintiff Lahr because, as explained above in Section I.B., Plaintiff Balanzar has never been enrolled in MyVoice and, thus, the provisions of Fidelity's customer account agreements relating to MyVoice simply are not relevant to her.

those documents are incorporated by reference into the Complaint, and the Court is allowed to consider them on a motion to dismiss. *Corinthian Colls*., 655 F.3d at 999; *McCoy v. Alphabet, Inc.*, Case No. 20-cv-05427-SVK, *2 (N.D. Cal. Feb. 2, 2021) (incorporating by reference various versions of defendant's privacy policy and terms of service).

                 1.     Plaintiff Lahr's claim fails because she agreed to have Massachusetts law govern this dispute.

       Plaintiff Lahr's agreement to a Massachusetts choice-of-law provision bars her from bringing her claim under CIPA.  In actions such as this one brought under the Class Action Fairness Act, a federal court applies choice-of-law rules for the state in which the court sits—here, California.  *AI CA LLC v. CreditautoUSA Financial Co. LLC*, 2022 WL 4798128, at *3 (S.D. Cal. Sept. 20, 2022) (citing *Fields v. Legacy Health Sys*., 413 F.3d 943, 950 (9th Cir. 2005)).  California law reads choice-of-law agreements broadly to cover any conduct—contractual or extra-contractual—that arises from the agreement at issue.  *Nedlloyd Lines B.V. v. Super. Ct*., 3 Cal. 4th 459, 470 (1992); *Jergens, Inc. v. 5th Axis, Inc*., 2021 WL 1139417, at *4 (S.D. Cal Mar. 25, 2021).  California enforces agreements to apply a foreign state's laws if: (1) the foreign state has a substantial relationship to the parties or their transaction, or there is any other reasonable basis for the parties' choice of law; and (2) the foreign state's law is not contrary to a fundamental public policy of California.  *AI CA LLC*, 2022 WL 4798128, at *3 (citing *Nedlloyd*, 3 Cal. 4th at 466).

       Here, Lahr's customer account agreement specifies that "[t]his agreement and its enforcement are governed by the laws of the Commonwealth of Massachusetts, except with respect to its conflicts-of-law provisions."  Brown Decl., Ex. 1 at 17 and Ex. 2 at 35.  In addition, Lahr's claim that Fidelity violated section 637.3 by creating her voiceprint without express written consent (Compl. ¶ 41) "arises" directly from her customer account agreement, in which Lahr expressly

authorized Fidelity to "create a digital representation of [her] voice, a 'voiceprint,' that may be used for verifying [her] identity when [] contact[ing] Fidelity." *See* Brown Decl., Ex. 1 at 6.

Because Fidelity's use of MyVoice is encompassed by Lahr's customer account agreement with Fidelity, it is covered by the agreement's Massachusetts choice-of-law provision. And that agreement is enforceable because (1) Massachusetts—where Fidelity is headquartered—has a substantial relationship to the parties and their transaction, *see* Compl. ¶ 14; and (2) applying Massachusetts law would not contravene any fundamental public policy of California. *See Ludlow v. Flowers Foods, Inc.*, 2021 WL 4460821, at *7 (S.D. Cal. Sept. 29, 2021). Having agreed that Massachusetts law would govern any disputes with Fidelity related to her account, Lahr is now precluded from bringing this claim for violation of CIPA, a California statute. *E.g.*, *Jergens, Inc.*, 2021 WL 1139417, at *6 (dismissing California UCL claim where parties' agreement contained enforceable Ohio choice-of-law provision).

> 2. **Plaintiff Lahr's claim fails because she provided express written consent to Fidelity's use of MyVoice.**

Plaintiff Lahr's claim also fails because she provided express written consent to the terms of Fidelity's customer account agreement, including to the use of MyVoice, more than a year before filing this lawsuit.

Section 637.3(a) prohibits the use of voiceprints for voice stress analysis only if it occurs "without [the subject's] express written consent given in advance of the examination or recordation." Here, when Lahr opened a new account with Fidelity on November 25, 2020, she provided express written consent to Fidelity's use of MyVoice. Brown Decl., Ex. 1 at 6. More specifically, to open her new account, Lahr electronically accepted the terms of Fidelity's customer account agreement; and, in that agreement, Lahr expressly authorized Fidelity to "create a digital representation of [her] voice, a 'voiceprint,' that may be used for verifying [her]

identity when [she] contact[s] Fidelity." *Id*.[10]

The Complaint acknowledges, and courts in this District agree, that an "affirmative act" such as clicking a checkbox qualifies as express written consent. Compl. ¶ 30 (alleging that "express written consent" as used in section 637.3 would include "a signature, an e-signature, a checkbox, or some other affirmative written act"); *see, e.g.*, *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) ("Courts have routinely found clickwrap agreements enforceable."); *Cuenco v. Clubcorp USA, Inc*., 2021 WL 2453279, at *4 (S.D. Cal. June 16, 2021) (granting motion to compel arbitration and finding user consented to terms by clicking a check-box).  Lahr's electronic acceptance of Fidelity's customer account agreement in November 2020 therefore constitutes "express written consent" to Fidelity's use of MyVoice.[11]

Because CIPA has a one-year statute of limitations, Cal. Civ. Proc. Code § 340; *Brodsky v. Apple, Inc.*, 445 F. Supp. 3d 110, 134 (N.D. Cal. 2020), and Lahr did not file suit until September 11, 2022—more than a year after providing express

---

[10] As noted, above, the customer account agreement also included a provision titled "Fidelity MyVoice" stating: "Fidelity MyVoice is a free security service. When you call Fidelity, you'll no longer have to enter PINs or passwords because Fidelity MyVoice helps you interact with us securely and more conveniently. Through natural conversation, MyVoice will detect and verify your voiceprint in the first few moments of the call. A voiceprint is a combination of your physical and behavioral voice patterns. Like a fingerprint, it's unique to you."  Brown Decl., Ex. 1 at 9. Were this case to proceed to discovery, the evidence would show that Fidelity's customer account agreement has, in fact, contained these provisions disclosing MyVoice and authorizing Fidelity to use voiceprints for identification purposes since 2017, the year MyVoice was launched.

[11] As explained above in Section II.D, the customer account agreement and Lahr's acceptance thereof may be considered for purposes of this motion because the agreement is incorporated by reference into the Complaint.  If the Court does not agree that this argument is suitable for resolution on a Rule 12(b)(6) motion, however, then Fidelity respectfully requests that the Court convert this portion of its motion to a motion for summary judgment.

written consent to the use of MyVoice—her claim is untimely.  The Complaint's attempt to invoke the "delayed discovery" rule does not change this outcome.  *See Fox v. Ethicon Endo-Surgery, Inc*., 35 Cal. 4th 797, 808 (2005) (to rely on rule, plaintiffs "must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence").  Plaintiffs allege that they "had no way of knowing" prior to September 2022 that their voices were "recorded for purposes of creating voice prints" because Fidelity "kept this information secret." Compl. ¶ 46.  But these conclusory assertions are belied by (1) Plaintiffs' reliance on the MyVoice FAQs, which the Complaint concedes have been available on Fidelity's website since at least 2018; (2) Plaintiffs' citation to Fidelity's customer account agreement, which they concede has included a provision on MyVoice since at least January 2021 (more than a year before suit); and (3) Plaintiffs' reference to numerous media articles and public blog posts about MyVoice, *see, e.g.,* Compl. ¶¶ 5-6, 24-27, 29.[12]  And, with respect to Plaintiff Lahr, they are further belied by the fact that she entered into a customer account agreement with Fidelity on November 25, 2020—well over a year before filing suit—that expressly disclosed, explained, and secured her consent to Fidelity's use of MyVoice.

## CONCLUSION

For each of the foregoing reasons, the Court should dismiss Plaintiffs' Complaint against Fidelity in its entirety and with prejudice.

---

[12]  Were this case to proceed to discovery, the evidence would also show that, since launching MyVoice in 2017, Fidelity's practice has always been to verbally inform customers when they are being enrolled in MyVoice, and then to immediately confirm that enrollment by sending an email and/or a text message to the contact information on file for that customer.

1  DATED:  November 3, 2022                     Respectfully submitted,

2                                            O'MELVENY & MYERS LLP

3

4                                            By: */s/ Randall W. Edwards*

5                                            Randall W. Edwards

6                                            Jonathan P. Schneller

7                                            Rebecca A. Girolamo

8

9                                            *Attorneys for Defendant Fidelity*

10                                            *Brokerage Services LLC*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-26-