Trenton Kashima (CA SBN 291405)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
401 West C St., Suite 1760
San Diego, CA 92101
Tel: (714) 651-8845
tkashima@milberg.com

*Additional attorneys on signature page*

*Attorneys for Plaintiffs*
*and the Putative Classes*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMIR BALANZAR and CECELIA LAHR, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>FIDELITY   BROKERAGE   SERVICES, LLC,<br><br>    Defendant. | Case No: 3:22-cv-01372-GPC-BGS<br><br>**PLAINTIFFS' OPPOSITION TO FIDELITY BROKERAGE SERVICES LLC's MOTION TO DISMISS PLAINTIFFS' COMPLAINT**<br><br>Date:        January 27, 2023<br>Time:        1:30 PM<br>Judge:       Hon. Gonzalo P. Curiel<br>Ctrm:        Courtroom 2D |

# **TABLE OF CONTENTS**

**PAGE(S)**

TABLE OF AUTHORITIES ........................................................................... ii

I.    INTRODUCTION ............................................................................. 1

II.   ARGUMENT ..................................................................................... 3

   A.   Plaintiffs State a Claim Under California Law ................................... 3

      1.   California Law Applies to this Dispute ...................................... 3

         a.   This dispute is within the scope of
              the choice-of-law provision ............................................ 3

         b.   Use of the choice-of-law provision to limit the
              CIPA is against a fundamental public policy of the State ................... 5

      2.   Plaintiff did not Consent to Defendant's use of MyVoice ......................... 8

      3.   Plaintiff Sufficiently Alleges a Violation of
           Cal. Penal Code  § 637.3 ........................................................ 12

      4.   The Place of Injury was California ............................................. 15

      5.   The Statute of Limitations does not Bar the Case ............................... 17

III.  CONCLUSION ................................................................................... 18

# TABLE OF AUHTORITIES

**CASES**        **PAGE(S)**

*Ades v. Omni Hotels Mgmt. Corp.*,
46 F.Supp.3d 999 (C.D. Cal. 2014)...........................................................6

*Ashcroft v. Iqbal*,
129 S.Ct. 1937 (2009) ............................................................................3

*Baxter v. Fairfield Fin. Servs., Inc.*,
307 Ga.App. 286, 704 S.E.2d 423 (2010) ...............................................5

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ...........................................................................3, 10

*Brack v. Omni Loan Co.*,
164 Cal.App.4th 1312 (2008)..................................................................6

*Brennon B. v. Sup. Ct.*,
13 Cal.5th 662 (2022) ...........................................................................13

*Brodsky v. Apple, Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ..................................................17

*City and County of San Francisco v. Farrell*,
32 Cal.3d 47 (1982)..............................................................................13

*Coram Healthcare Corp. v. Aetna U.S. Healthcare,* Inc.,
94 F.Supp.2d 589 (E.D. Pa. 1999) ..........................................................5

*Diamond Multimedia Systems, Inc. v. Sup. Court*,
19 Cal.4th 1036 (1999).........................................................................16

*Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*,
890 F.2d 165 (9th Cir. 1989) ..................................................................4

*Erceg v. LendingClub Corp.*,
475 F.Supp.3d 1071 (N.D. Cal. 2020) ....................................................7

*Fields v. Legacy Health Sys.*,
413 F.3d 943 (9th Cir. 2005)...................................................................5

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal.4th 797 (2005)...........................................................................17

- ii -

*Garaux v. Pulley,*
   739 F.2d 437 (9th Cir. 1984) ...................................................................................... 9

*Grafton Partners v. Sup. Ct.,*
   36 Cal. 4th 944 (2005) ............................................................................................... 13

*In re Katz Interactive Call Processing Pat. Litig.,*
   883 F.Supp.2d 935 (C.D. Cal. 2010) ......................................................................... 14

*Jergens, Inc. v. 5th Axis, Inc.,*
   No.: 20-CV-2377-CAB-BLM, 2021 WL 1139417 (S.D. Cal Mar. 25, 2021) ........... 7

*Kearney v. Salomon Smith Barney, Inc.,*
   39 Cal.4th 95 (2006) .............................................................................................. 7, 16

*Ludlow v. Flowers Foods, Inc.,*
   No.: 18-CV-1190 TWR (JLB), 2021 WL 4460821 (S.D. Cal. Sept. 29, 2021) ......... 7

*Matrixx Initiatives, Inc. v. Siracusano,*
   131 S.Ct. 1309 (2011) .................................................................................................. 3

*Mays v. City of Los Angeles,*
   43 Cal.4th 313 (2008) ................................................................................................ 13

*Merrimack Valley Nat. Bank v. Baird,*
   372 Mass. 721 (1977) ............................................................................................ 4, 12

*Nedlloyd Lines B.V. v. Sup. Ct.,*
   3 Cal. 4th 459 (1992) ................................................................................................... 6

*People v. Barksdale,*
   No. C065880, 2012 WL 50643 (Cal. Ct. App. Jan. 10, 2012) (unpublished) .......... 15

*People v. King,*
   266 Cal.App.2d 437 (1968) .................................................................................. 13, 15

*People v. L.,*
   40 Cal.App.3d 69, 75 (1974) ............................................................................... 14, 15

*People v. Lee,*
   95 Cal. App. 4th 772 (2002), as modified (Feb. 20, 2002) ....................................... 15

*People v. Otto,*
   2 Cal.4th 1088 (1992) ................................................................................................ 14

- iii -

*People v. Valladoli*,
13 Cal.4th 590 (1996)............................................................13

*Pieri v. City & Cnty. of San Francisco*,
137 Cal.App.4th 886 (2006)....................................................14

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011)...................................................3

*State v. Hall* (1894)
114 N.C. 909, 19 S.E. 602......................................................16

*Tri-Union Seafoods, LLC v. Starr Surplus Lines Ins. Co.*,
88 F.Supp.3d 1156 (S.D. Cal. 2015)..........................................6

*Yan Guo v. Kyani, Inc.*,
311 F. Supp. 3d 1130 (C.D. Cal. 2018)........................................4

**<u>STATUTES</u>**

47 C.F.R. § 64.1200(f)(9) ........................................................9

Cal. Penal Code § 630.............................................................6

Cal. Penal Code § 637.3(a) ...............................................passim

Cal. Corp. Code, § 25400 ......................................................16

California Invasion of Privacy Act ("CIPA") § 637.3 ...................3, 5

**<u>OTHER AUTHORITIES</u>**

Leflar, *American Conflicts Law* (4th ed.1986) § 111, pp. 309–311 ............16

Restatement (Second) of Conflict of Laws § 187 (1971)......................5, 6

Restatement (Second) of Conflicts of Laws, § 202 ............................7

**<u>RULES</u>**

Fed. R. Civ. P. 12(b)(6) .........................................................3, 9

Fed. R. Civ. P. 12(d) ..............................................................9

Fed. R. Civ. P. 56 (d) .............................................................9

- iv -

1  Plaintiffs Emir Balanzar[1] and Cecelia Lahr respectfully submits this Opposition
2  to Defendant Fidelity Brokerage Services, LLC's Motion to Dismiss to Plaintiffs'
3  Complaint [ECF No. 11-1] ("Motion"):[2]

4  ## I.  __INTRODUCTION__

5  This is a relatively simple case. Defendant utilizes the "Fidelity MyVoice"
6  system that examines "voice prints" of any account holder who calls, in order to
7  determine whether individuals are who they are claim. *See generally* Plaintiffs'
8  Complaint, ECF No. 1 ("Compl."). Essentially, the MyVoice system is an identity fraud
9  prevention tool, that matches the biometric voice print of each caller, including speech
10  patterns, breathing patterns, use and repetition of certain phrase, and pitch and volume
11  of voice. *Id.,* at ¶¶ 3, 33. This is a sophisticated system that analyzes the unique acoustic
12  and behavioral features of a caller's voice, including stress patterns, to determine truth
13  or falsity of statements. *Id.,* at ¶¶ 32-34. If the voice prints do not match, Defendant
14  assumes that the caller is lying about their identity and can response accordingly.

15  This system does not use any passphrases or other codes, like other common
16  methods of identification. Declaration of Randall Edwards, ECF No. 11-3 ("Edwards
17  Decl."), Ex. A at pp. 4-5. Instead, it works in the background during the first few
18  minutes of the call. *Id.*; Compl. at ¶ 3. Customers are, thus, not immediately aware that
19  MyVoice is recording and analyzing their call. Plaintiffs pled that Defendants have
20  been secretly using this system since 2017 and did not disclose that it was using the
21  technology until January of 2021. Compl. at ¶ 27. At this time, Defendant may have
22  sent a Notice of Change of Terms to its customers, first acknowledging the MyVoice
23  Program.[3] Compl. at ¶ 3. Yet, the language in Defendant's new Customer Account

---

[1] Prior to the filing of this opposition Plaintiff Emir Balanzar dismissed her claims without prejudice. (ECF No. 13). Plaintiff Cecelia Lahr remains. But, to the extent that Plaintiff Balanzar was enrolled in MyVoice, she remains an absent classs member.

[2] Plaintiffs do not oppose Defendant's Request for Judicial Notice, ECF No. 11-4.

[3] Although, Defendants uses extraneous facts in the Declaration of Diane Brown, ECF No. 11-2 ("Brown Decl.") to claim otherwise.

- 1 -

Agreements only disclosed the existence of the program; not that account holders would be automatically enrolled. *See* Brown Decl., Ex. 1 at p. 9.

Instead, Defendant's own documents expressly state that individual account holders will only be enrolled in the MyVoice system if they specifically opt-in to program during a telephone with Fidelity agent. Edwards Decl., Ex. A at pp. 5-6. This seems to be the only method used by Defendant to confirm that a consumer has authorized use of their voice prints.

While the MyVoice system is new, the technology on which it is based has a long history. Nor is Defendant's particular application of the technology novel in the law. Prosecutors and police have used voice-print technology since the 1960s to identify individuals and test the veracity of statements.

It was likely this use of voice prints in criminal trials that prompted the California Legislature to limit their use outside the courtroom. In 1978, California enacted section 637.3 of the Penal Code, with specifically prohibits the use of any system that records or analyzes "voice prints" to determine the truth or falsity of statements, without prior express written consent. Yet, Defendant failed to secure either express written consent or prior consent for use of its MyVoice system. Accordingly, Defendant has violated the law.

Defendant responds to Plaintiffs' Complaint by throwing the kitchen sink at the Court. Defendant provides extraneous facts through untested witnesses, argues that the California Penal Code does not apply to calls originating from the state, challenges the plain reading of section 637.3 to immunize themselves from its application, and ignores the facts of the Complaint to raise an unsupported statute of limitations defense. When these arguments are examined in detail, however, Defendant's demurrer to Plaintiffs' Complaint can be overruled.

II.   **ARGUMENT**

    A.   **Plaintiffs State a Claim Under California Law**

When deciding a motion pursuant to Rule 12(b)(6), courts are directed to accept all factual allegations in the complaint as true and to draw any reasonable inferences in the light most favorable to the plaintiff. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555-556 (2007). Ultimately, the Court may not dismiss a complaint in which the plaintiff has alleged "sufficient factual matter… to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009).

Plausibility exists when the facts pled "raise[s] a reasonable expectation that discovery will reveal evidence" of wrongdoing and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1312 (2011). Accordingly, the Ninth Circuit holds that the allegations only need to "give fair notice" of the plaintiff's legal and factual claims "to enable the opposing party to defend itself effectively" in a way "that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

    1.   California Law Applies to this Dispute

As a threshold matter, the Court must determine what law applies to the dispute. Defendant contends that due to the choice-of-law provision within the Customer Account Agreement that Massachusetts law applies and not the California Invasion of Privacy Act ("CIPA"). *See* Motion at pp. 22-23. This argument, however, is misplaced.

        a.   *This dispute is within the scope of the choice-of-law provision*

First, before even examining the enforceability of the choice-of-law provision; the Court must determine if the dispute falls within the scope of the clause. Defendant selectively quotes the provision to make it appear boarder than it is. *Id.* at p. 22. When quoted in its entirety, the choice-of-law provision makes it clear that it would accommodate local variation in the law:

**This Agreement and its enforcement are governed by the laws of the Commonwealth of Massachusetts, except with respect to its conflicts-of-law provisions.**

All transactions through Fidelity are subject to the rules and customs of the marketplace where they are executed, as well as applicable state and federal laws. In addition, the services below are subject to the following laws and policies:

- Securities trades: any Fidelity trading policies and limitations that are in effect at the time
- Online services: the license or usage terms posted online
- Checkwriting: the applicable provisions of the Uniform Commercial Code and the terms governing the service

Brown Decl., Ex. 1 at 17 and Ex. 2 at 35 (emphasis in original).  The fact that the Customer Account Agreement specifically concedes that transactions will be subject to applicable state and federal laws, foreclosures Defendant's argument.[4]

Indeed, given that the choice-of-law provision provides that transactions, and other services, are subject to additional rules and regulations, "the most the apparent interpretation of this language is that the term applies only to the interpretation and construction" (as well as the enforcement) of the contractual terms of the Customer Account Agreement.  *Yan Guo v. Kyani, Inc*., 311 F. Supp. 3d 1130, 1145–46 (C.D. Cal. 2018) (holding that a provision that read the "Agreement shall be governed exclusively by the laws of the State of Idaho" did not extend beyond its interpretation and construction).  "This conclusion is consistent with the views of other courts." *Id.,* citing, e.g., *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc*., 890 F.2d 165, 171 (9th Cir. 1989) (choice of law provision in franchise agreement that provided that "this agreement shall be construed in accordance with the laws of the state of the Licensee's Operating Locality" only governed, by its express terms, the "construction or

---

[4] While it is unclear if "transactions" means "securities transactions" or something broader, any ambiguity will be construed against the drafter.  *Merrimack Valley Nat. Bank v. Baird,* 372 Mass. 721, 725 (1977).  Thus, transactions should be read to include enrollment into the MyVoice Program.

interpretation of the franchise agreement itself"); *Coram Healthcare Corp. v. Aetna U.S. Healthcare,* Inc., 94 F.Supp.2d 589, 593 (E.D. Pa. 1999) (choice of law provision that provided that the relevant contract "shall be governed by the laws of the State of Delaware" encompassed only those claims "relating to the construction and interpretation" of that agreement and therefore excluded claims arising out of "tortious conduct that led up to the execution of the contract or to other actions arising out of the [parties'] relationship"); *Baxter v. Fairfield Fin. Servs., Inc.*, 307 Ga.App. 286, 704 S.E.2d 423, 428 (2010) (choice of law provision that provided that a contract "shall be governed by the laws of Florida" applied only to enforcing "contractual duties").

Here, the dispute does not arise from the interpretation and construction, or the enforcement of the parties' contractual obligations, but a violation of the statutory protections provided by CIPA. Accordingly, the choice of law provision does not govern this dispute.

      b.   *Use of the choice-of-law provision to limit the CIPA is against a fundamental public policy of the State*

But even assuming that the choice-of-law provision applies to this dispute, it still may not be used to escape requirements of the California Penal Code, and specifically CIPA. "Federal courts sitting in diversity jurisdiction look to the law of the forum state in choice-of-law determinations." *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005).[5] As Defendant recognizes, California follows the approach set forth in the Restatement (Second) of Conflicts of Laws, section 187, which sets forth the following standard:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

---

[5] This is particular true here, where the choice of law provision expressly states that Massachusetts law does not apply to the conflict of laws analysis. Brown Decl., Ex. 1 at 17 and Ex. 2 at 35

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of §188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*See* Motion at p. 22, *see also Nedlloyd Lines B.V. v. Sup. Ct.*, 3 Cal. 4th 459, 465 (1992). While Plaintiffs do not challenge the former exception, they do challenge the latter.

"California courts have recognized that there are no 'bright line rules for determining what is and what is not contrary to a fundamental policy of California.'" *Tri-Union Seafoods, LLC v. Starr Surplus Lines Ins. Co.*, 88 F.Supp.3d 1156, 1168 (S.D. Cal. 2015) (citation omitted). To be "fundamental", the "policy must be a substantial one." *Id.* (citing *Brack v. Omni Loan Co.*, 164 Cal.App.4th 1312, 1323 (2008)). Fundamental policies "may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power." Comment (g) to Restatement (Second) of Conflict of Laws § 187 (1971).

Here, the prohibitions set forth in the Penal Code are undoubtedly fundamental policies of the state. Cal. Penal Code § 630 (in enacting CIPA, the California legislature specifically stated that its intent was to "protect the right of privacy of the people of this state" and that the statute was designed to combat "a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.") Not only does CIPA protect the privacy of California residents by making certain acts illegal, CIPA punishes violators with criminal sanctions. Indeed, in the context of Restatement, section 188, several courts have held that CIPA represents an overriding public policy, applying to both individuals and business residing within California. *See, e.g.*, *Ades v. Omni Hotels Mgmt. Corp.*, 46 F.Supp.3d 999, 1008–11 (C.D. Cal. 2014); *Erceg v.*

*LendingClub Corp.*, 475 F.Supp.3d 1071, 1078 (N.D. Cal. 2020) ("California has a greater interest in applying its privacy laws [i.e. CIPA] to protect the citizens of its states than Massachusetts does in applying its privacy laws to protect the citizens of a different state.")  Even the California Supreme Court noted that application of foreign law, to avoid proving the protections of CIPA to California residents, "would impair California's interest in protecting the degree of privacy afforded to California residents." *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal.4th 95, 100 (2006).  On the other hand, application of California law, to California residents, has limited impact on Massachusetts.  *Id.* ("application of California law will not have a significant detrimental effect on Georgia's interests as embodied in the applicable Georgia law, because applying California law (1) will not adversely affect any privacy interest protected by Georgia law, (2) will affect only those business telephone calls in Georgia that are made to or are received from California client").  Accordingly, Defendant may not use a choice-of-law clause to avoid application of the California Penal Code to actions that occurred within the state.

Defendant's citation to *Ludlow v. Flowers Foods, Inc*., No.: 18-CV-1190 TWR (JLB), 2021 WL 4460821 (S.D. Cal. Sept. 29, 2021) and *Jergens, Inc. v. 5th Axis, Inc*., No.: 20-CV-2377-CAB-BLM, 2021 WL 1139417 (S.D. Cal Mar. 25, 2021) does not alter this conclusion.  Motion at p. 23.  *Ludlow* involves a challenge to a loan, between business entities, under California's usury laws.  *See generally, Ludlow, supra.*  Yet, the Restatement (Second) of Conflicts of Laws, section 202, specifically allows contracting parties to select the usuary laws which will apply, so long as the:

> interest rate stipulated in the contract is permitted in a state which has a substantial relationship to the transaction and the parties and (2) is not greatly in excess of the rate permitted by the general usury statute of the state of the otherwise applicable law.

The Restatement does not specifically allow Defendant to ignore the California Penal Code.  Similarly, *Jergens* involved a violation of the Ohio Uniform Trade Secrets Act

and a non-disclosure agreement.  *Jergens, Inc., supra*, at \*2.  The non-disclosure agreement provided that the Laws of the State of Ohio would govern the "the rights, obligations and remedies of the parties."  *Id.*, at \*3.  While both parties conceded that Ohio substantive law applied, defendants argued that the Ohio Uniform Trade Secrets Act claim was barred by California's statutes of limitations due to Ohio's "borrowing" statute.  *Id.*, at \*4.  Accordingly, the principal question was in *Jergens* was one of statutory interpretation, not fundamental interests.  Neither of these cases remotely address the issue at bar.

### 2.   Plaintiff did not Consent to Defendant's use of MyVoice

Defendant further argues that the Court does not need to reach question regarding the scope and application of CIPA because section 637.3(a) does not prohibit the use of voiceprints if Plaintiffs provides "express written consent [ ] in advance of the examination or recordation."  Cal. Penal Code § 637.3(a).  Defendant states that Plaintiff Lahr agreed to enroll in MyVoice through the 2020 Customer Account Agreement.  Motion at pp. 23-25.  This is not true.

While "express written consent" is not defined within the CIPA, Defendant concedes that some manifestation of consent, such as a signature, an e-signature, or a checkbox, is required.  Motion at p. 24.  Additionally, a review of other statutes addressing the express written consent standard can also be edifying.  The Telephone Consumer Protection Act also requires "express written consent" before sending a prerecorded or auto-dialed telemarketing calls.  The FCC has defined express written consent as:

> an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

47 C.F.R. § 64.1200(f)(9). Accordingly, "express written consent" requires at least two elements: (1) a written manifestation of consent; (2) to a clear authorization to engage in the activity in question. While the Complaint alleges (and Defendant offers no contradictory evidence) that the consent did not occur "in advance of the examination or recordation;" the clear written authorization is also lacking. Cal. Penal Code § 637.3(a).

First, Defendant ignores the allegations of the Complaint, instead inserting their own facts through the Brown Declaration. The Complaint plainly alleged that Plaintiff Lahr became a client of Defendant around 2017 and called Defendant on numerous occasions. Compl. at ¶¶ 38-39. The Complaint further alleges that Defendant recorded Plaintiffs' voices and created "voice prints" associated with Plaintiffs as soon as 2017. *Id.*, at ¶¶ 40-43. And Plaintiffs alleged that they did not give consent – written or otherwise – to Defendant to collect voice prints and examine Plaintiffs' voice for any purpose whatsoever. *Id.*, at ¶¶ 45.

Defendant, on the other hand, states that Plaintiff "when Lahr opened a new account with Fidelity on November 25, 2020, she provided express written consent to Fidelity's use of MyVoice [in the Customer Account Agreement]." Motion at p. 23. Ignoring for the moment that Defendant may not cite such extraneous facts without converting its Motion to Dismiss into one for summary judgment, nowhere does Ms. Brown actually state that Plaintiff Lahr expressly consented to the Customer Account Agreement in 2020.[6] *See generally* Brown Decl.; Fed. R. Civ. R § 12(d). Ms. Brown

---

[6] While Defendant suggests that the Court had simply convert this "portion" of Motion to one for summary judgement, the process is not that simple. Motion at p. 24. Instead, Plaintiffs are entitled to notice and an opportunity to present opposing evidence. *See Garaux v. Pulley,* 739 F.2d 437, 438 (9th Cir. 1984) (converting a Rule 12(b)(6) Motion to a motion for summary judgment requires that the non-moving party "be afforded a reasonable opportunity to present all material made pertinent to such a motion by Rule 56."); Fed. R. Civ. P. § 56 (d) ("If a nonvovant shows by affidavit or declaration that, it cannot present facts essential to justify its opposition, the court may:

does not state that the new Customer Account Agreement was provided to Plaintiff Lahr, that Plaintiff Lahr manifested her consent in any meaningful way, or that she had not been enrolled in the MyVoice Program prior to this purported disclosure.[7]   *See generally* Brown Decl.  Instead, the Court should take the facts alleged in the Complaint as true.  *Twombly,* 550 U.S. at 555; Compl. ¶¶ 38-40 ("Plaintiffs did not give consent – written or otherwise – to Defendant to collect voice prints" and that when Plaintiff Lahr did become a Fidelity account holder in 2017, Defendant already included her in the MyVoice program).

But assuming, *arguendo*, that Plaintiff Lahr did view and consent to the Customer Account Agreement in 2020, it would not alter the outcome of this case.  While the Customer Account Agreement does disclose the existence of the program, it does not in-and-of-itself indicate that Plaintiff Lahr consents to enroll into MyVoice.   The relevant clause of the Customer Account Agreement states:

> **Fidelity MyVoice®**
> Fidelity MyVoice® is a free security service. When you call Fidelity, you'll no longer have to enter PINs or passwords because Fidelity MyVoice helps you interact with us securely and more conveniently. Through natural conversation, MyVoice will detect and verify your voiceprint in the first few moments of the call. A voiceprint is a combination of your physical and behavioral voice patterns. Like a fingerprint, it's unique to you.

Brown Decl., Ex. 1 at p. 9 and Ex. 2 at p. 26 (emphasis in original).

This Agreement must be read in conjunction with Defendant's other disclosures, which indicate that consumers must opt-in to MyVoice, regardless of the acceptance of the Customer Account Agreement:

---

… allow time to obtain affidavits or declarations or to take discovery.").   Summary Judgment, at this phase of the dispute, is not warranted.

[7] Strangely, Defendant argues that that "to open her new account, Lahr electronically accepted the terms of Fidelity's customer account agreement" citing the Brown Declaration.  Motion at p. 23.  Yet, the Brown Declaration does not expressly state that Plaintiff Lahr agreed to anything, electronic or otherwise.  *See generally* Brown Decl.

How do I enroll?
Call 1-800-Fidelity today and say "account access" when prompted. From there it's simple, just tell the associate you're interested, and then all you have to do is speak and Fidelity MyVoice will automatically create a unique voiceprint for you. Once you're enrolled, you'll find out how much easier accessing your account securely can be.

[…]

How do I enroll in Fidelity MyVoice?
As a Fidelity customer, *the next time you call, a representative will offer to enroll you*. To enroll, *you just need to give Fidelity consent to create your unique voice print*.

Edward Decl., Ex. A at p. 5 (emphasis added).

Thus, the disclosure in the Customer Account Agreement is far from express written consent to join MyVoice, but only advertises the existence of the MyVoice program. The preceding and subsequent provisions in the Customer Account Agreement illustrate this dichotomy. Directly before the MyVoice clause, is a provision that governs Fidelity BillPay, noting that "Fidelity BillPay® service is free and allows you to pay your bills online. It can be set up to make fixed payments automatically, and you can also use it to send variable periodic payments on demand to designated payees." Brown Decl., Ex. 1 at p. 9 and Ex. 2 at p. 26. This provision simply explains the availability of a "free service" without providing any obligation to use it. On the other hand, the provision directly following the MyVoice clause regarding "Mobile Phone Number Security Check" leaves no doubt as Plaintiffs' authorization:

In order to protect your account, we may review any changes made to your mobile phone number to ensure that a newly entered number is not associated with any known fraudulent activity. *You authorize your mobile provider to disclose information about your mobile phone account…*

*Id.* (emphasis added).

- 11 -

Thus, the MyVoice clause in the Customer Account Agreement is ambiguous at best.  In such situations, any ambiguity must be resolve in favor of Plaintiffs and the Class.  *Merrimack Valley Nat. Bank,* 372 Mass. at 725.  Indeed, the ambiguity of the MyVoice clause in the Customer Account Agreement is even recognized by Defendant itself.  Defendant does not enroll consumers into MyVoice automatically when they establish their accounts; MyVoice is only used after Plaintiffs (and other consumers) opt into the program, providing their oral consent during a subsequent phone call.  Compl. at ¶¶ 7-10 (citing https://www.fidelity .com/security/fidelity-myvoice/overview which can be found attached to Edward Declaration at Ex. A); Edward Decl., Ex. A at p. 5 (describing the enrollment process); Brown Decl. at ¶ 8 (noting that consumers must be "enrolled in Fidelity MyVoice").[8]  If the Customer Account Agreement represented clear and unequivocal express written consent to enroll in MyVoice, why would Defendant need to solicit additional consent?

Nonetheless, much of these arguments are beyond the scope of this Motion.  Factual disputes, such as whether there was express written consent, is best left for after discovery.

> 3.   Plaintiff Sufficiently Alleges a Violation of Cal. Penal Code
>        § 637.3

Defendant primary argument is that its conduct, as alleged, is not a violation of Cal. Penal Code, section 637.3, because this statute "does not regulate the use of biometric voiceprints for purposes of customer identification."  Motion at pp. 10-19.  Section 637.3(a) provides, in its entirety:

> No person or entity in this state shall use any system which examines or records in any manner voice prints or other voice stress patterns of another person to determine the truth or falsity of statements made by such other person without his or her express written consent given in advance of the examination or recordation.

---

[8] Although, Plaintiff claims that consumers were enrolled in MyVoice even before the program was disclosed to the public.  *Id*. at ¶¶ 8, 24-25.

1    Cal. Penal Code § 637.3(a).

2         Plaintiff agrees that the fundamental task, in interpreting statutes, is "to determine

3    the Legislature's intent so as to effectuate the law's purpose."  Motion at p. 10 citing

4    *Brennon B. v. Sup. Ct.*, 13 Cal.5th 662, 673 (2022).  Of course, the starting point is "the

5    actual words of the statutes in question, giving them a plain and commonsense

6    meaning."  *People v. Valladoli*, 13 Cal.4th 590, 597 (1996).  If there is no ambiguity,

7    then courts "presume the lawmakers meant what they said, and the plain meaning of the

8    language governs."  *Mays v. City of Los Angeles*, 43 Cal.4th 313, 321 (2008).  Only if

9    there is an ambiguity, does the Court "resort to extrinsic sources, including the

10   ostensible objects to be achieved and the legislative history."  *Id.*

11        First, Plaintiffs must establish that Defendant uses a "system which examines or

12   records in any manner voice prints or other voice stress patterns."  While Defendant

13   does not challenge that it uses a system that analyzes voice data, Defendant argues that

14   term "voice prints" should be understood as being limited to the voice stress patterns

15   given is proximity to the "or other voice stress patterns" language in the statute.  Motion

16   at p. 11 citing *Grafton Partners v. Sup. Ct.*, 36 Cal. 4th 944, 960 (2005).  Defendant

17   states that it does not analyze "voice stress patterns," and the statute is applicable.  Yet,

18   this approach is flawed.  Interpreting "voice prints" as being the same as, and being

19   coextensive with, "voice stress patterns" would render "voice prints" pure surplusage;

20   a result that should be avoided.  *City and County of San Francisco v. Farrell*, 32 Cal.3d

21   47, 54 (1982) ("In construing the words of a statute or constitutional provision to discern

22   its purpose, the provisions should be read together; an interpretation which would render

23   terms surplusage should be avoided, and every word should be given some significance,

24   leaving no part useless or devoid of meaning.").

25        Instead, the phrase "voice prints" should be given its plain meaning.  When

26   section 637.3 was originally drafted in 1978, "voiceprints" was not novel term within

27   the law.  At that time, "voiceprints" were being first used to identify speakers in criminal

28   cases.  *See, e.g., People v. King,* 266 Cal.App.2d 437 (1968); *People v. L.*, 40

- 13 -

1  Cal.App.3d 69, 75 (1974).  As a California Court of Appeal explained, "voiceprints"

2  was defined as:

> A sound spectrogram (voiceprint) is produced by a machine known as a
> spectrograph. It is a basic tool for analyzing speech sounds. When the tape
> of a voice is properly fed through a spectrograph, a graph is produced
> which analyzes three main perimeters of speech: time, frequency and
> intensity of the frequency. [fn.] The examiner analyzes a spectrogram of
> the 'known' and 'unknown' voices to determine identity, *i.e*., whether the
> known voice is the same as the unknown voice, or elimination, i.e.,
> whether the known voice is not the same as the unknown voice.

9  *People v. L*., 40 Cal.App.3d at 75–76.  The Legislature is presumed to be aware of these

10 cases when it enacted section 637.3.  *Pieri v. City & Cnty. of San Francisco*, 137

11 Cal.App.4th 886, 893 (2006).  Accordingly, the plain meaning of "voice prints" should

12 be given the same definition as its contemporaneous judicial (and technical)

13 understanding.[9]  Defendant's convoluted argument that "voice prints" is "a type of

14 voice stress pattern" should not override the plain meaning of the term.  *People v. Otto*,

15 2 Cal.4th 1088, 1108 (1992) ("Where, as here, legislative intent is expressed in

16 unambiguous terms, we must treat the statutory language as conclusive; "no resort to

17 extrinsic aids is necessary or proper.").

18      In this case, MyVoice is undoubtedly a "system which examines or records in

19 any manner voice prints."  Cal. Penal Code § 637.3(a).  As Plaintiffs alleged MyVoice

20 is "system contains voice recognition software that creates a biometric voice print of

21 each caller."  *See, e.g.,* Compl. ¶ 3.  Defendant's own marketing confirms the same.

22 Edward Decl., Ex. A at p. 4 (Through natural conversation, MyVoice will detect and

23 verify your voiceprint* in the first few moments of the call).

24

---

25      [9] Is also important to note that this understanding of has not changed over time.  *See
In re Katz Interactive Call Processing Pat. Litig.,* 883 F.Supp.2d 935, 959 (C.D. Cal.
2010) (noting that voice prints are used for identification).  Even Defendant uses the
term "Voice Print" in the same manner of these fifty-year-old decisions.  Edward Decl.,
Ex. A at pp. 5-6 ("A voice print is a set of characteristics associated with your unique
voice pattern.").

26

27

28

- 14 -

But Plaintiffs must also establish that MyVoice is designed "to determine the truth or falsity of statements."  Defendant suggests that section 637.3 only covers "lie detection," excluding Defendant's use of the voice prints as a means of identification.  Motion, at pp. 15-19.  Yet, "lie detection" does not exclude systems that ensure individuals are properly identifying themselves.  The MyVoice is innately designed to prove the "truth or falsity" of a particular statement, namely that accountholders are who are they claimed to be.  Compl. ¶ 64.  Given that the Legislature specifically chose to include the term "voice prints" (a term that was traditionally used to describe a process that correctly identifies individuals by their voice), the Court should not create an unwritten exception for systems that examine the truth or falsity of self-identification statements from section 637.3.  *King,* 266 Cal.App.2d 437; *People v. L.*, 40 Cal.App.3d 69, 75.  Indeed, the original "lie detector"—polygraphs—have been used (or at least proposed to be used) to determine whether people were lying about the identity of individuals. *See, e.g., People v. Barksdale,* No. C065880, 2012 WL 50643 (Cal. Ct. App. Jan. 10, 2012) (unpublished); *People v. Lee*, 95 Cal. App. 4th 772, 785 (2002), as modified (Feb. 20, 2002).  Defendant's MyVoice system should not be treated any different.  Accordingly, Plaintiffs state a claim under section 637.3.

### 4.    The Place of Injury was California

Defendant next argues that Plaintiffs do not allege that Defendant conducts the MyVoice analysis in this state and, therefore, Defendant is not subject to section 637.3.  Motion at pp. 19-21.  Defendant bases its argument on the language of the statute that provides that "[n]o person or entity *in this state* shall use any system which examines or records in any manner voice prints…." Cal. Penal Code § 637.3(a) (emphasis added).  Defendant then states that "[t]he plain meaning of the statute's phrasing— "in this state"—limits its reach to California-based activity."  Motion at pp. 19-20.

This strained argument is not supported by the law.  The cases cited by Defendant seem to support the opposite position.  When addressing CIPA violations, as Defendant

notes, the California Supreme Court has interpreted that the CIPA applies to telephone conversations between a California resident and an out-of-state business, regardless of the fact that such transactions are "multistate event[s]." Motion at pp. 19-20 citing *Kearney*, 39 Cal.4th at 119. This is not surprising because the Supreme Court held that the "crucial element—the confidential communication by the California resident— occurred *in California*." Motion at pp. 19-20 citing *Kearney*, 39 Cal.4th at 119.

But Defendant suggests that this passage supports the contention that the use of a system, which examines or records voice prints, located outside the state, is specifically excluded. *Id. Kearney* counsels otherwise:

> A person who secretly and intentionally records such a conversation from outside the state effectively acts within California in the same way a person effectively acts within the state by, for example, intentionally shooting a person in California from across the California–Nevada border. (See, for example, *State v. Hall* (1894) 114 N.C. 909, 19 S.E. 602, 602–606; see generally Leflar, American Conflicts Law (4th ed.1986) § 111, pp. 309–311.) Because there can be no question but that the principal purpose of section 632 is to protect the privacy of confidential communications of California residents while they are in California, we believe it is clear that section 632 was intended, and reasonably must be interpreted, to apply in this setting.

*Kearney*, 39 Cal.4th at 119–20. Accordingly, California law does not distinguish between the place of the recording (or analysis), when the 'victim' caller is within the state.

Similarly, Defendant's citation to *Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal.4th 1036 (1999), is also unavailing. *Diamond* examined California Corporation Code, section 25400, that makes it "unlawful for any person, directly or indirectly, in this state: [¶] For the purpose of creating a false or misleading appearance of active trading in any security or a false or misleading appearance with respect to the market for any security… ." *Diamond Multimedia Sys., Inc.*, 19 Cal.4th at 1050-51. The Court held that this statute applies to both securities purchases made within the

- 16 -

state, as well as out-of-state purchasers who engaged with California businesses.  *See id.* at 1065.  This opinion does not support the finding that an out-of-state business can avoid California law by "shooting someone from over the broad."

Here, Plaintiffs allege "Defendant continues to examine voices in California without express written consent" and seeks to represent a class of California residents that were similarly harmed.  Compl. ¶¶ 50-51.  The fact that Defendant recorded and examined calls of California consumers, who speaking within this state, is sufficient to violation section 637.3(a).

### 5.   The Statute of Limitations does not Bar the Case

Finally, Defendant argues that Plaintiff Lahr did not file her CIPA claims within the one-year statute of limitations.  Motion at pp. 24-25 citing *Brodsky v. Apple, Inc.*, 445 F. Supp. 3d 110, 134 (N.D. Cal. 2020).  Plaintiff Lahr file her lawsuit on September 11, 2022, but alleges that "delayed discovery" rule tolls the statute of limitations.  Compl. ¶ 46.  More specifically, Plaintiff Lahr alleges that she never enrolled in MyVoice, so there is no reason for her to believe that that her voice was being recorded and analyzed under the program.  *Id.*; *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 808 (2005) (to rely on rule, plaintiffs "must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence")

Defendant argues that its Customer Account Agreement and other disclosures should have put her on notice that she was being recorded.  Yet, Defendant own website and communications notes that Plaintiff Lahr should have never been included in the MyVoice Program without her affirmatively opting in:

> How do I enroll in Fidelity MyVoice?
> As a Fidelity customer, the next time you call, a representative will offer to enroll you. To enroll, *you just need to give Fidelity consent to create your unique voice print*.

OPPOSITION TO MOTION TO DISMISS                    Case No. 3:22-cv-01372-GPC-BGS

1   Edward Decl., Ex. A at p. 5 (emphasis added).  Given that Defendant can only determine

2   if a person is enrolled MyVoice by cross referencing several internal business records,

3   it is not reasonable to believe that Plaintiff Lahr should have been able to discovery that

4   she was secretly included in MyVoice program.  *See* Brown Decl., ¶¶ 7-8.

5        Indeed, the operation of MyVoice works in the background, without Plaintiffs

6   having affirmatively engage the system:

7        How it works
     When you call Fidelity, you'll no longer have to enter PINs or passwords
8        because Fidelity MyVoice helps you interact with us securely and more
     conveniently. Through natural conversation, MyVoice will detect and
9        verify your voiceprint* in the first few moments of the call

10

11       [¶]

12
     To enroll in Fidelity MyVoice, will I need a specific phrase prepared? No,
13       Fidelity MyVoice is based on natural conversation, so there's no need for
     a password or security phrase.
14

15   Edward Decl., Ex. A at pp. 4-5.  Accordingly, Plaintiff Lahr cannot have known that

16   her voice was being recorded and analyzed by Defendant, tolling the statute of

17   limitations.[10]

18   **III.   CONCLUSION**

19       For the foregoing reasons, Defendant's Motion should be denied in its entirety.

20   Should the Court grant Defendant's Motion in any part, Plaintiff respectfully requests

21   leave to amend.

22

23

24

25   _____
     [10] Even if Plaintiff Lahr did receive notice that Defendant was enrolling her in
26   MyVoice in 2020, it would not magically forgive Defendant's transgressions prior to
     this date.  Section 637.3 requires authorization prior to Defendant's use of the MyVoice
27   system.  *See* Cal. Penal Code, § 637.3(a).  Plaintiffs allege that Defendant was recording
     Plaintiff Lahr as early as 2017.  Compl. at ¶¶ 38-40.
28
                                        - 18 -

1    DATED: December 2, 2022                Respectfully submitted,

2
                                           By: /s/ Trenton Kashima
3
4                                          Trenton Kashima (CA SBN No. 291405)
                                           **MILBERG COLEMAN BRYSON**
5                                          **PHILLIPS GROSSMAN PLLC**
                                           401 West C St., Suite 1760
6                                          San Diego, CA 92101
7                                          Tel: (714) 651-8845
                                           tkashima@milberg.com
8
9                                          John J. Nelson (SBN 317598)
                                           **MILBERG COLEMAN BRYSON**
10                                         **PHILLIPS GROSSMAN, PLLC**
11                                         401 W Broadway, Suite 1760
                                           San Diego, CA 92101
12                                         Tel.:   (858) 209-6941
13                                         jnelson@milberg.com

14                                         Joshua Brandon Swigart
                                           **SWIGART LAW GROUP, APC**
15                                         2221 Camino Del Rio South
16                                         Suite 308
                                           San Diego, CA 92108
17                                         (866) 219-3343
18                                         Fax: (866) 219-8344
                                           Email: josh@swigartlawgroup.com
19
20                                         Daniel G. Shay
                                           **LAW OFFICE OF DANIEL G. SHAY**
21                                         2221 Camino Del Rio South
22                                         Suite 308
                                           San Diego, CA 92108
23                                         (619) 222-7429
24                                         Fax: (866) 431-3292
                                           Email: DanielShay@TCPAFDCPA.com
25
26                                         *Attorneys for Plaintiffs*
                                           *and the Putative Classes*
27

28
                                        - 19 -